1

2

3

4

5

6

7

8                              IN THE UNITED STATES DISTRICT COURT

9                                EASTERN DISTRICT OF CALIFORNIA

10   PUONGPUN SANANIKONE,

11            Plaintiff,                         No. CIV S-07-1434 KJM

12        v.

13                                              ORDER
     UNITED STATES OF AMERICA,
14   et al.,

15            Defendants.
     _____/

16

17            Plaintiff Puongpun Sananikone (Sananikone) has moved for a new trial following

18   a jury's verdict finding that he was responsible for collecting payroll taxes and failing to pay

19   them for a number of quarters.  The court held oral argument on the motion on February 24,

20   2012.  David Kirsch and William Adams appeared for plaintiff; Colin Sampson and Michael

21   Pitmann appeared for the government.  After considering the parties' argument, their briefing

22   and supplemental briefing, the court DENIES plaintiff's motion.

23   /////

24   /////

25   /////

26   /////

                                                  1

I. BACKGROUND[1]

American Steel Frame, Inc. (ASFI) was incorporated in 1999 and manufactured steel frame houses.  ECF No. 148 at 2.  From July 1999 through October 2001, Sananikone was the Chairman of the Board.  ECF No. 148 at 2.  He owned PacMar U.S. Asia Development Corporation.  Both he and PacMar owned stock in ASFI.  ECF No. 148 at 2.  Sananikone did not draw a salary from ASFI during his time as Chairman of its board, was not a signatory on any of ASFI's bank accounts, and did not sign its federal tax returns.  ECF No. 148 at 3.

ASFI did not pay its federal withholding taxes for the second, third and fourth quarters of 2000 and the second, third, and fourth quarters of 2001.  ECF No. 148 at 2.  Sananikone at some point became aware that ASFI had failed to pay its federal payroll taxes.  ECF No. 148 at 3.  ASFI filed bankruptcy in 2002.  ECF No. 148 at 2.

In 2006, the IRS sent plaintiff a notice of assessment of tax liability against Sananikone as provided by 26 U.S.C. § 6672.  ECF No. 1 at 2.

In 2007, Sananikone filed this action seeking abatement of the Trust Fund Recovery Penalty.  ECF No. 1.  The government answered and filed a counterclaim against Sananikone, seeking to have the assessment reduced to judgment.  ECF No. 9.

The case went to trial in October 2011.  On October 27, 2011, the jury returned a verdict for the government.  ECF No. 226.

After the verdict plaintiff filed a motion for judgment under Federal Rule of Civil Procedure 50, or, in the alternative, for a new trial under Rule 59.  The court denied the Rule 50 motion in an oral ruling and solicited supplemental briefing on the Rule 59 motion.

/////

/////

/////

_____

[1]  This account is drawn from the undisputed facts section of the court's pretrial order, as well as other documents on the court's docket.

1  II.  STANDARD FOR A MOTION FOR A NEW TRIAL

2         Under Federal Rule of Civil Procedure 59(a)(1), the court may grant a new trial

3  "on all or some of the issues ... (A) after a jury trial, for any reason for which a new trial has

4  heretofore been granted in an action at law in federal court."  Because "Rule 59 does not specify

5  the grounds on which a motion for a new trial may be granted," district courts must look to

6  "grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc*., 339 F.3d

7  1020, 1035 (9th Cir. 2003). These grounds include a verdict that is contrary to the weight of the

8  evidence or is based on false or perjurious evidence; an excessive award of damages; or

9  unfairness to the moving party.  *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th Cir. 2007).  A

10  court may order a new trial if an erroneous evidentiary ruling substantially prejudiced a party or

11  if its instructions were erroneous or inadequate.  *Harper v. City of Los Angeles*, 533 F.3d 1010,

12  1030 (9th Cir. 2008); *Jazzabi v. Allstate Ins. Co.*, 278 F.3d 979, 985 n.24 (9th Cir. 2002).  "The

13  grant of a new trial is 'confided almost entirely to the exercise of discretion on the part of the

14  trial court.'"  *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990).  Even though

15  "the trial court may weigh the evidence and credibility of the witnesses," it should not grant a

16  new trial "merely because it might have come to a different result from that reached by the jury."

17  *Roy v. Volkswagen of Am., Inc*., 896 F.2d 1174, 1176 (9th Cir.) (internal quotation marks

18  omitted), *amended on denial of rehearing*, 920 F.2d 618 (9th Cir. 1990).

19  III.  ANALYSIS

20         Plaintiff argues that the evidence at trial was insufficient to show he was a

21  responsible person who willfully failed to pay ASFI's withholding taxes.  He also argues that the

22  government's lawyer committed misconduct in closing argument, which influenced the jury's

23  verdict.

24  /////

25  /////

26  /////

A.  Withholding Generally

Under 26 U.S.C. §§ 3402 and 3403, an employer must withhold certain taxes from employees' wages and is liable for the taxes withheld, which are deemed to be held in trust to the United States. *United v. Technical Knockout Graphics, Inc.* (*In re Technical Knockout Graphics, Inc.*), 833 F. 2d 797, 799 (9th Cir. 1987); 26 U.S.C. § 7501.  If the employer does not pay the withheld taxes, the Internal Revenue Service (IRS) may assess a 100 percent penalty on certain people.  There are two requirements: "(1) the party assessed was a 'responsible person,' i.e., one required to collect, truthfully account for and pay over the tax," and (2) the responsible person "willfully refused to pay the tax."  *United States v. Jones*, 33 F.3d 1137, 1139 (9th Cir. 1994) (internal citations, quotation marks omitted); *United States v. Uptergrove*, No. 1:06–CV–1630–AWI–GSA, 2008 WL 3850833, at *4 (E.D. Cal. Aug. 13, 2008), *recommendation adopted by* 2008 WL 4370106 (E.D. Cal. Sep. 24, 2008).  When the government has satisfied its initial burden of proof by introducing its evidence of the assessment of taxes, as it did here, the taxpayer has the burden of showing he is not liable for the assessment. *Oliver v. United States*, 921 F.2d 916, 919-20 (9th Cir. 1990); ECF No. 213.

B.  The Facts as Developed at Trial[2]

Plaintiff Sananikone was an economic development planner for PacMar, which worked on developing infrastructure in resource-rich regions of the Third World, with the goal of reducing poverty.  10/20 RT at 136, 138-39.

Paul Ta approached Sananikone and Gary Ryness in June or July 1999, seeking board members for ASFI, his fledgling company.  10/20 RT at 141.  Ta recruited Ryness because he was CEO and Chairman of the Board of a company that marketed new home communities in California and plaintiff because of his international contacts. 10/19 RT at 34, 38-39.  Ta told plaintiff that light gauge steel framing had the potential of solving the housing shortage in the

---

[2]  These are taken from the trial transcripts.

Third World.  10/20 RT at 141.  Ta asked plaintiff to be chairman of the Board because the position is respected in Asia and he felt plaintiff would be a good person to communicate this new technology to the Third World.  10/20 RT at 147.  Ta told him that the chairman's main responsibility would be presiding over board meetings called by the management team.  10/20 RT at 148.  Plaintiff claimed that his only experience in board membership stemmed from his charitable work, but then conceded he and his family own all the shares of Pacmar and plaintiff sits on its board. 10/20 RT at 148; 10/24 RT at 52.

Plaintiff protested to Ta he could not contribute financially, so Ta asked for a nominal contribution in exchange for stock options.  10/20 RT at 152.  Plaintiff contributed $4000 and received four million shares of ASFI stock.  10/24 RT at 113.  Ryness also received stock in return for an initial investment; although the stock was being sold, it was valued at a penny a share.  10/19 RT at 46-47; ECF No. 261-2 at 18.

Ta convened two organizational meetings for the prospective ASFI board in 1999. 10/19 RT at 150.  At the first of these, Ta introduced AFSI's officers, including himself as CEO. 10/19 RT at 40, 44.  The board agreed to appoint John McDonald as president of ASFI and to purchase McDonald's equipment.  10/20 RT at 176.  Plaintiff signed the promissory note connected with this purchase because it was ASFI's policy to require four signatures on a promissory note and McDonald, who was the seller, could not sign as buyer.  10/24 RT at 12-13, 16; ECF No. 258-5.  Plaintiff did not sign any other promissory notes on behalf of ASFI.  10/24 RT at 17.

The bylaws of the ASFI board described the chairman's duties as presiding at meetings of the board of directors and exercising other powers and duties assigned by the board or prescribed by the bylaws.  10/10 RT at 79.

In October 1999, plaintiff received a copy of an ASFI organizational chart, which described the chairman's role as providing "superior strategic direction through the effective management of the board of directors."  10/20 RT at 156.  It described the chairman's duties as

directing board meetings, approving updates to the corporation business plan (though plaintiff understood this would devolve upon the whole board), approving and distributing minutes of the Board meetings (though plaintiff said the Board had the authority to approve the minutes and Ta, as secretary, distributed them), approving the creation of special task forces (though again plaintiff claimed this was a board responsibility), approving any compensation for the Board, though no board members received any salaries unless they were also officers of the corporation, recruiting Board members, approving the aims and objections of the Board (though plaintiff testified they did not do that), approving diversification opportunities (plaintiff testified that he did not know what that meant and, whatever that meant, he believe it was the responsibility of the management), establishing performance indicators (again plaintiff testified that this was not a job for the Board), monitoring the company and meeting regularly with the president and vice-president regarding the company's activities (plaintiff said this was impossible, as he was overseas most of the time). 10/19 at 88; 10/20 RT at 159-166.  Ryness also said the board did not exercise the authority provided for it in the bylaws.  10/19 RT at 89.

Although board members generally were not compensated, plaintiff's company PacMar was reimbursed for his ASFI-related travel and time and expenses; this agreement for reimbursement was reduced to writing.  10/20 RT at 168, 170, 172.  This agreement provided that ASFI could call on plaintiff's services for short-term projects, including management.  10/24 RT at 57.

Once ASFI was established, its board held three meetings in 2000 and meetings in January, April, July and October 2001.  10/19 RT 150-51.  The company's financial difficulties were a board topic from the first meeting.

At the board meeting on January 7, 2000, Ta reported that ASFI had cash flow problems.  10/19 RT at 95.  The board asked what had happened to Trong Le's initial $500,000 investment, but never received an accounting of how much of Le's promised $500,000 investment was actually put into the company.  10/19 RT at 98, 109.  The board instructed the

1  executive committee to prepare a proper financial report, to be submitted immediately; the report

2  was not generated. 10/19 RT at 99.  At this meeting, the board appointed Grage as president after

3  being informed of McDonald's personal bankruptcy.  ECF No. 261-3 at 3.

4          In January 2000, plaintiff faxed a memo to McDonald, chastising him for

5  authorizing a variety of payments when the company was having difficulty meeting payroll;

6  observing that McDonald had not followed the financial control procedure the board had

7  established during its first meeting; and suggesting that if the executive team failed to develop a

8  better plan for managing ASFI's finances, the executives should submit their resignations so the

9  board could "chose [sic] appropriate measure to re-organize ASFI."  ECF No. 261-2 at 12-13.

10 Plaintiff also emailed Ryness about ASFI's financial problems, suggesting that they should make

11 fundamental changes to avoid a recurrence of the problem.  ECF No. 261-2 at 14.  Sometime

12 after that, Ryness emailed plaintiff about getting "more serious with the officers of the company .

13 . . . to make sure the new president was addressing the main issue which was the funding of the

14 internal operations . . . ."  10/19 RT at 105; ECF 261-2 at 14-15.

15         A special board meeting was called in February 2000 to discuss, among other

16 things, how to get Le to fund his contribution or otherwise find new money so the company

17 could continue to operate until progress payments came in.  10/19 RT at 111-112.

18         The next board meeting was in November 2000. 10/19 RT at 115.  Plaintiff

19 introduced Mr. Vo, a new investor and stockholder, and Henk Intveld, the new ASFI president.

20 10/19 RT at 118-119.  Intveld had been hired as operations manager for ASFI, but after the third

21 president resigned in a period of months, plaintiff repeated his request that Intveld take over as

22 president.  10/25 RT at 158.  Intveld and Vo became members of the board at plaintiff's request.

23 10/25 RT at 160-61; ECF No. 261-6 at 1.

24         Intveld said ASFI needed a half a million dollars right away to stay current with

25 vendors and taxes, but Ryness claimed it was unclear whether the reference was to income,

26 payroll or sales tax.  10/19 RT at 121, 124-125.  Ryness described the financial data Ta produced

as "incomprehensible" and said it did not include information about taxes owed, among other things.  10/19 RT at 125.

Charlene Amarante was hired as bookkeeper for AFSI; Intveld was president when she started and he and Ta ran the company. 10/19 RT at 168, 171, 172.  She knew plaintiff, but saw him at ASFI only a couple of times.  10/19 RT at 172.  In the beginning she took her questions about money to Ta and Intveld, but later directed her questions to the Board.  10/19 RT at 172.

Amarante prepared accounts payable and receivable reports, which she gave to Ta and Intveld.  10/19 RT at 74.  When Ta left, she gave them to Intveld and Yaeger, who was hired in 2001.  10/19 RT at 74.  Every Friday, Amarante ran a report showing what was owed and to whom.  She provided this report to Intveld and later to Yaeger as well.  10/19 RT at 177.  Intveld told her what checks to print and sometimes told her not to mail checks that had been signed. 10/19 RT at 177-178.  She ran reports using Timberline, an accounting software program for the construction trade; the reports showed that ASFI owed payroll taxes.  10/20 RT at 11-12. Neither Ta, Yaeger, nor Intveld told her to pay the trust fund taxes.  10/19 RT at 179-180.

In January 2001, Amarante asked Intveld to sign payroll tax returns.  It was then he learned that ASFI was behind several quarters; he informed plaintiff, who said he "would take this up with Paul Ta."  10/25 RT at 166.

At the January 2001 board meeting, Ryness complained that the financial statements were inadequate in that they did not address taxes and commissions owed to Ryness's company, among other things.  10/25 RT at 53-54; ECF No. 261-7 at 2.  At this meeting, Intveld said he told the board about the delinquency; he acknowledged that the minutes of that meeting do not reflect this.  10/25 RT at 171.  Ryness suggested that Ta, the Board secretary, took some liberties with the minutes because potential investors would read them when considering whether to invest.  10/19 RT at 127, 158.  Ryness also believed Ta deceived the stockholders because it was in his interest, as an employee of ASFI, to keep the company afloat.  10/19 RT at 163.

1       Plaintiff acknowledged he may have told an IRS investigator that he first learned

2   of the delinquent taxes at the January 2001 board meeting.  10/24 RT at 143.

3       Amarante told plaintiff about the payroll tax delinquency in an email she sent in

4   April 2001, noting her hope that "everybody is continuing to be aware that the payroll taxes are

5   still not being paid."  10/20 RT at 17, 18.  She thought that informing the Board might prompt

6   some action.  10/20 RT at 19.  Amarante believed plaintiff had the authority to direct her to pay

7   the payroll taxes.  10/20 RT at 31.  Ta also said he told plaintiff about the arrearage before the

8   April board meeting. 10/25 RT at 63.  Plaintiff denied receiving the email, claiming that

9   Amarante had sent it to an old email address.  10/24 RT at 25.

10      Although PacMar's accounting department generally handled all of plaintiff's

11  reimbursement requests to ASFI, on one occasion plaintiff faxed a request directly to Amarante

12  because Ta had been giving the accounting department "the run-around."  10/24 RT at 66-67.

13  He personally provided the invoice to ASFI just before the April 2001 board meeting.  10/24 RT

14  at 68.  This invoice covered expenses for the November 2000 board meeting and included a

15  section for phone/fax expenses from August 1999 through November 2000.  10/24 RT at 71.  He

16  testified that calls to Stockton on that invoice were related to ASFI.  10/24 RT at 75.  Another

17  invoice plaintiff personally asked to be paid showed calls to Stockton, which plaintiff said were

18  made in association with ASFI.  10/24 RT at 92; *see* ECF Nos. 258-3 & 258-4.

19      At the Board meeting of April 2001, Intveld said that ASFI had not been paying

20  payroll taxes and now owed a substantial amount.  10/24 RT at 20; 10/25 RT at 62.  Intveld

21  explained that Ta had made a unilateral decision not to pay the trust fund taxes, calling it "free

22  money."  10/24 RT at 26.  According to the minutes, "Mr. Sananikone expressed shock and

23  dismay that the decision to postpone payment of taxes had been made without the prior

24  knowledge of the board.  He asked what lawful remedial measures could be taken to rectify this

25  problem. . . . The board agreed that henceforth all applicable taxes owed will be paid on time

26  strictly as required by relevant federal and state laws."  10/24 RT at 20, 26; ECF No. 261-8 at 2.

Plaintiff said that "in spite of repeated requests by the board for regular financial reporting . . ., ASFI continues to lack any regular financial reporting to the board, nor an acceptable financial reporting system which allows the board to track and keep abreast of the financial operation of the company from the time of its founding to date." 10/24 RT at 21. Plaintiff also noted that "financial data presented to the board seemed to have been customized for each board meeting and that many crucial data are not included nor disclosed in the financial report." 10/24 RT at 22; ECF No. 261-8 at 1. This conclusion was based on the fact that Ta's financial data consisted almost entirely of projections of cash flows and potential income. 10/24 RT at 22. Ta suggested some of the problems in producing adequate data stemmed from the fact that the Timberline software had been cut off because ASFI owed about $7,000. Plaintiff said that if the software was so critical to financial reporting and control, "the payment of the overdue of $7000 should have been accorded top priority over other executive payments, e.g. executive perks and new executive hiring." 10/24 RT at 129. Plaintiff asked Intveld to reexamine ASFI's practice of determining priorities for payment. *Id*. The Board voted to relieve Ta of CFO duties and to appoint Vo as CFO. 10/24 RT at 129; ECF No. 261-8 at 2.

At the July 2001 board meeting, Intveld said that ASFI was current on the first quarter of payroll taxes, but that the second quarter payment of $175,000 was due. 10/19 RT at 131. Ta said there should have been sufficient funds to cover the indebtedness. However, as the Board was unable "to adjudicate between the different views of availability of funds for tax payment," plaintiff asked "that the accounts . . . be updated forthwith and the payment of payroll taxes must be taken care of immediately above all other priorities." 10/19 RT at 131-132. Plaintiff continued that the board was impeded in its financial oversight duties by the incomplete accounting information presented to the board. 10/19 RT at 132. As Ryness explained, without knowing whether the money "already existed in the accounts," they could not determine "how much of that money was available for business purposes." 10/19 RT at 134. Later in the meeting Intveld said that Ta "had made [a] unilateral decision and instructed accounting staff

1  Charlene to withhold payment of payroll taxes." 10/19 RT at 137. The Board then told Ta that

2  "payroll taxes should be paid strictly in accordance with the requirements of the law and that in

3  the future if an executive decision was to be made about matters such as deferring payment of

4  taxes, the board must be advised forthwith and the unanimous prior decision of the board would

5  be required." 10/19 RT at 138. Intveld unsuccessfully attempted to resign after the July

6  meeting, presenting his resignation to plaintiff and Vo. 10/25 RT at 159, 181.

7           William Yaeger started as ASFI's controller in July 2001, with the goal of doing

8  "whatever [was] necessary to get the financials working properly so they could find out where

9  they were." 10/20 RT 50-51. Before he started, the payroll taxes were being accounted for as

10 accounts payable; a check would be cut, but not mailed out because there were no funds. 10/20

11 RT at 53. Yaeger ultimately determined that ASFI was losing $5,000 to $10,000 per house.

12 10/20 RT at 55. Ta left approximately two weeks after Yaeger started. 10/20 RT at 56.

13          Yaeger told plaintiff and the president that ASFI could not survive without more

14 funds and that the company was technically bankrupt. 10/20 RT at 98-99. He identified this

15 conversation as occurring at an August 2001 board meeting, but there was little other evidence

16 that such a meeting had occurred; plaintiff testified he had been in Laos at the time. 10/24 RT at

17 33, 39-40.

18          Yaeger resigned in August 2001, but came back as an independent contractor

19 later at Vo's request. 10/20 RT at 99-100. Plaintiff received word of Yaeger's resignation in

20 September 2001. 10/24 RT at 34. When Yaeger returned, he concentrated on fixing the

21 financials but from time to time plaintiff would ask him to do other things. 10/20 RT at 102.

22          Intveld resigned in August 2001 and was replaced by Michael Goodman. 10/25

23 RT at 159, 182; 10/19 RT at 174. As part of his resignation, Intveld asked the board for a release

24 from responsibilities and lawsuits; plaintiff was one of the people who approved this. 10/25 RT

25 at 189. When Goodman replaced Intveld, the board became involved in hirings and firings.

26 10/19 RT at 174. After Intveld left, Yaeger reported to plaintiff. 10/25 RT at 125.

1    Ta claimed ASFI's problems were the result of mismanagement, so plaintiff asked

2   Yaeger to investigate.  10/20 at 114.  Yaeger went through the books and determined that the

3   problems stemmed from lack of cash, not mismanagement.  10/20 RT at 58.  He concluded that

4   ASFI was set up on an invalid business model and that Ta's projections were far-fetched.  10/20

5   RT at 63.  He provided a report of his investigation to plaintiff and to the president.  10/20 RT at

6   62-63, 124.

7    At its meeting of October 4, 2001, the Board received, for the first time since

8   ASFI was founded, a complete financial statement.  10/19 RT at 140; 10/24 RT at 41.  The

9   Board learned that it was costing ASFI more to manufacture steel than it received in revenue for

10  selling the steel.  10/19 RT at 141.  Ryness said that because the losses had been allowed to

11  continue without a report to the Board, the Board had been unable to consider other managerial

12  policy options, including shutting the business down.  10/19 RT at 142.  At the October 2001

13  board meeting, plaintiff asked to resign as chair because of the difficulties of coordinating board

14  activities from a distance; he remained on the board, however.  10/24 RT at 44; ECF No. 261-11

15  at 5-6.

16   After the October board meeting, Ryness loaned $60,000 to ASFI, but it was not

17  used to pay the delinquency; it was used to keep the company going. 10/4 RT at 157, 159.

18   Money was coming in from August through November 2001, through payments

19  from Schuler Homes and investments and loans.  10/20 RT at 103.  During the same period ASFI

20  was paying rent, utilities, suppliers, and payroll.  10/20 RT at 108.  One week when the president

21  was not available to tell Amarante which bills to pay, she and Yaeger made one small payroll tax

22  payment.  10/20 RT at 28, 109.  According to Yaeger, plaintiff called Yaeger the next day and

23  "chewed [him] out," saying that because the taxes had been paid, the suppliers could not be paid.

24  10/20 RT at 111.  Plaintiff told Yaeger "from there on there would be somebody there to decide

25  who gets paid . . . ."  10/20 RT at 111; 10/25 RT at 119.

26  /////

1    Plaintiff disagreed, claiming he did not meet Yaeger until November 2011 and did

2    not call him about the payroll taxes.  10/24 RT at 49.  Plaintiff said he never made a decision

3    about paying payroll taxes or vendors.  10/24 RT at 49.  He never spoke to Yaeger on the phone.

4    10/24 RT at 50.  Yaeger testified to the contrary that he called plaintiff "every time

5    there was something that came up."  10/25 RT at 120.  He was aware that others faxed things for

6    plaintiff to look at or approve.  10/25 RT at 122.  Yaeger sought plaintiff's approval before

7    acting, and characterized plaintiff as micro-managing the company.  10/25 RT at 124-125.

8    On November 9, 2001, plaintiff joined Ryness and Vo and others in advising the

9    shareholders of the company's predicament.  10/24 RT at 47.  The December 2001 board

10   meeting was called for the purpose of closing ASFI.  10/24 RT at 169.

11   C.   Was Plaintiff A Responsible Person?

12   As he did in his Rule 50 motion, plaintiff relies largely on *Godfrey v. United*

13   *States*, 748 F.2d 1568 (Fed. Cir. 1984), to argue that his limited role as Chairman of the Board

14   does not establish that he was a responsible party.  In *Godfrey*, the court concluded:

15   In no case has an outside director of a publicly held corporation,
     who neither signed nor had authority to sign checks, who did not
16   participate in the day-to-day fiscal management of the corporation,
     who did not control the payroll, who did not determine which
17   creditors would be paid and which would not, and who did not
     own a significant fraction of the corporation's voting securities,
18   been held a "responsible" person under § 6672.

19   *Id*. at 1576.  Plaintiff contends that because his role in ASFI's affairs was similarly limited, a

20   new trial is warranted.

21   The government argues that the Ninth Circuit has broadly defined the concept of

22   "responsible person":  "Responsibility is a matter of status, duty, and authority," which "turns on

23   the scope and nature of an individual's power to determine how the corporation conducts its

24   financial affairs"; a person may be deemed responsible if his authority allowed him "to exercise

25   significant control over the corporation's financial affairs, regardless of whether he exercised

26   such control in fact."  *Purcell v. United States*, 1 F.3d 932, 937 (9th Cir. 1993); *see also Graham*

13

1   *v. United States*, 309 F. 2d 210, 212 (9th Cir. 1962) (recognizing that one who was solely a

2   member of a board could be a responsible person if the board "'had the final word as to what

3   bills should or should not be paid, and when'" (quoting *Wilson v. United States*, 250 F.2d 312,

4   316 (9th Cir. 1957)).  As both the Federal and Ninth Circuits have recognized, this court must

5   consider the facts before it to determine whether the plaintiff was responsible.  *Godfrey*, 748

6   F.2d at 1575 (the determination hinges upon the application of the facts to the provisions of the

7   Internal Revenue Code); *Pac. Nat. Ins. Co. v. United States,* 422 F.2d 26, 31 (9th Cir. 1970)

8   (stating that § 6672 "was designed to cut through the shield of organizational form and impose

9   liability upon those actually responsible for an employer's failure to withhold and pay over the

10   tax).  Among the facts relevant to this determination are "'the individual's duties as outlined in

11   the corporate bylaws, his ability to sign checks, his status as an officer or director, and whether

12   he could hire and fire employees.'" *United States v. Jones*, 33 F.3d 1137, 1140 (9th Cir. 1994)

13   (quoting *Hochstein v. United States*, 900 F.2d 543, 547 (2d. Cir. 1990)).  A person's knowledge

14   of the delinquency does not, by itself, establish that person's responsibility to pay the taxes.  *Id*.

15   at 1142.

16          In this case, as in *Godfrey*, plaintiff exercised the authority granted to a board

17   member by the bylaws, by approving and authorizing certain expenditures.  Intveld testified that

18   the board approved money for refurbishing equipment and anything else "out of the ordinary,"

19   for example.  10/25 RT at 161, 170.  But early in his tenure as board chair, plaintiff was talking

20   about reorganizing ASFI in response to its initial cash-flow crisis, an authority nobody disputed

21   he had.  This apparent authority is reflected in Amarante's and Yaeger's belief that plaintiff

22   could authorize the payment of the withholding taxes.

23          The early emails and faxes introduced as evidence undercut plaintiff's attempts to

24   paint himself as too distant, because he lived in Hawaii and took frequent trips to Asia, to be

25   much involved in the day-to-day operations of ASFI.  As the January 2000 fax to McDonald

26   shows, plaintiff was in touch with corporate officers not only from Hawaii but also from New

1  Guinea, apparently checking on ASFI's financial picture through a call to Ta while plaintiff was

2  working simultaneously on a PacMar project.  ECF No. 261-2 at 12.  These communications

3  support the reasonable conclusion that plaintiff was not acting as a mere figurehead who

4  accepted the title only because of its cachet in Asia.

5        In addition, plaintiff became involved in some hiring decisions, as it was plaintiff

6  who solicited Intveld to accept the ASFI presidency after McDonald and Grage.  He similarly

7  became involved in day-to-day financial transactions, directing Intveld to reexamine the

8  priorities for payment after he learned that ASFI owed money for its crucial accounting software.

9  10/25 RT at 158; 10/24 RT at 129.

10        In addition, once the extent of ASFI's financial problems, including its tax

11  delinquency, became clear, plaintiff became more involved with day-to-day operations: Yaeger

12  described him as micro-managing ASFI.  Yaeger's testimony did present some credibility

13  problems, in that he described an August 2001 board meeting and a contact with plaintiff, then

14  when it appears that no such meeting was held.  Nevertheless, Yaeger testified that plaintiff

15  asked him to investigate Ta's claims of mismanagement and that he gave a copy of his report to

16  plaintiff and the president, and that he called plaintiff every time something came up.  In the

17  absence of concrete evidence that Yaeger confused plaintiff with someone else, Yaeger's

18  testimony in this respect is to be credited.  The fact that plaintiff became involved in day-to-day

19  management-type activities as ASFI floundered supports the jury's finding that he had the

20  authority, but perhaps did not always exercise it, from ASFI's inception.  *See* 10/24 RT at 57

21  (plaintiff's agreement with ASFI allowed it to call on him for projects, including management).

22        The Ninth Circuit has observed "[t]hat an individual's day-to-day function in a

23  given enterprise is unconnected to financial decision making or tax matters is irrelevant where

24  that individual has the authority to pay or order the payment of delinquent taxes," regardless of

25  whether he exercised such control in fact.  *Purcell*, 1 F.3d at 937.  As plaintiff had "'the effective

26  /////

1    power to pay taxes,'" he was a responsible person.  *Purcell*, 1 F.3d at 937 (quoting *Raba v.*

2    *United States*, 977 F.2d 941, 943 (5th Cir. 1992)).

3           D.  Did Plaintiff Act Willfully?

4                  "'[W]illfullness' for purposes of failing to pay over withholding taxes [is] a

5    'voluntary, conscious and intentional act to prefer other creditors over the United States.'"

6    *Phillips v. United States*, 73 F.3d 939, 942 (9th Cir.1996) (quoting *Klotz v. United States*, 602

7    F.2d 920, 923 (9th Cir. 1979)).  Willfulness may be established in two ways: the person's actual

8    knowledge that taxes were due coupled with a use of corporate funds to pay other expenses or

9    the person's reckless disregard of whether withholding taxes are being sent to the government.

10   *Phillips*, 73 F.3d at 942; *Sorenson v. United States*, 521 F.2d 325, 329 (9th Cir. 1975).  A person

11   is liable under the reckless disregard standard "if he (1) clearly ought to have known that (2)

12   there was a grave risk that withholding taxes were not being paid and if (3) he was in a position

13   to find out for certain very easily."  *United States v. Vacante*, 717 F. Supp. 2d 992, 1017-1018

14   (E.D. Cal. 2010); *see also Verret v. United States*, 542 F. Supp. 2d 526 (E.D. Tenn. 2008) ("If a

15   responsible officer has recently incurred a payroll tax delinquency and is aware of the

16   deteriorating affairs of the corporation, he runs the risk of being held personally liable for the

17   unpaid withheld payroll taxes if he fails to take steps to ascertain the state of the payroll tax

18   liabilities or to institute effective financial controls to guard against nonpayment."), *aff'd* 312 F.

19   App'x 615 (5th Cir. 2009).

20                  The evidence suggests that plaintiff knew of the delinquency in January 2001 and

21   it is undisputed that he was aware of it in April 2001.  The evidence also shows that around this

22   time plaintiff submitted his own reimbursement requests, apparently did not insist that Ryness'

23   $60,000 loan to ASFI be used for payroll taxes and did not direct that payments be withheld

24   from vendors or other creditors.

25                  Plaintiff argues, however, that his failure was not willful in light of the board's

26   direction that the taxes be paid.  The evidence shows that at the time the board adopted this

1   resolution, it had never received an adequate report of ASFI's financial health even though it had

2   asked for one several times.  Given the chaotic state of financial reporting and ASFI's chronic

3   cash-flow problems, plaintiff ought to have recognized the risk that taxes would not be

4   paid despite the board's resolution, something that could easily have been ascertained.  There is

5   sufficient evidence to support the jury's conclusion that plaintiff acted willfully.

6         E.  Closing Argument

7             Although plaintiff now argues that defense counsel's closing argument was

8   improper in two instances, he did not object at the time.  As a result, this court will evaluate the

9   claimed errors to determine whether "the integrity or fundamental fairness of the proceedings . . .

10  is called into serious question."  *Bird v. Glacier Elec. Coop, Inc.*, 255 F.3d 1136, 1149 (9th Cir.

11  2002); *see also Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) (stating that

12  plain error review requires a plain or obvious error that affects substantial rights or is prejudicial

13  and that has resulted in a miscarriage of justice).

14        i.  Plaintiff's Calls and Faxes to ASFI

15            In closing argument the government asked the jury to consider the number of calls

16  reflected on the reimbursement request he delivered to Amarante around the time of the April

17  2001 board meeting, as showing plaintiff's involvement in the day-to-day affairs of ASFI.  10/26

18  RT at 71.  Government counsel specifically identified a telephone number on the reimbursement

19  requests -- 209-982-9599 – suggesting that the many calls to that number showed plaintiff's

20  involvement with ASFI.  10/26 RT at 71-72.  The jury had a fax number for ASFI on the fax

21  plaintiff sent to McDonald on February 1, 2000 -- 209-982-9599 -- and could compare it with the

22  invoice plaintiff submitted to ASFI in April with its supporting telephone bills.  *See* ECF Nos.

23  258-3, 258-4, 261-2 at 12.[3]  During trial, plaintiff had conceded that any calls to Stockton

24  /////

---

26     [3]  Plaintiff argues that only the first page of US-35, one of the invoices, was admitted.
The court's records show that the entire exhibit was admitted.  ECF No. 219-2 at 2.

reflected on the invoice would have been made in connection with ASFI.  10/24 RT at 75, 92. The argument was not error.

        ii.  <u>The Value and Importance of Plaintiff's ASFI Stock</u>

Counsel for the government also argued that even though plaintiff purchased ASFI stock for a penny a share, he solicited family and friends to buy stock for considerably more, suggesting he believed it would gain value as the corporation became successful.  His stock ownership gave him an incentive to keep the corporation afloat.  10/26 RT at 65-66.

The jury heard evidence that shares were initially sold for a penny and could make its own evaluation of whether plaintiff's stock ownership gave him an incentive to direct that money be used to keep the business afloat.  The court does not find this argument to be plain error.  Even if it was in error, it was harmless in light of the court's instructions that it was the jury's province to evaluate the evidence and not to accept counsel's argument uncritically.  ECF No. 223 at 4, 6.

IT IS THEREFORE ORDERED that plaintiff's motion for a new trial (ECF No. 232) is denied.

DATED:  March 29, 2013.

 

_____
UNITED STATES DISTRICT JUDGE